David K. BOUTON, Arthur W. Buttenheim, Carl W. Shattuck, John C. Smaltz and G. Robert Compton, as Trustees in Liquidation of M-T Liquidation Corporation (formerly McKiernan-Terry Corporation) (Plaintiff)

v.

LITTON INDUSTRIES, INC., and Liberty Mutual Insurance Company (Defendant).

LITTON INDUSTRIES, INC., a Delaware Corporation (Plaintiff)

v.

David K. BOUTON, Arthur W. Buttenheim, Carl W. Shattuck, John C. Smaltz and G. Robert Compton, as Trustees in Liquidation of M-T Liquidation Corporation (formerly McKiernan-Terry Corporation, a corporation of the State of New Jersey)

Litton Industries, Inc., (One of the Defendants), Appellant.

No. 17979.

United States Court of Appeals, Third Circuit.

Argued Feb. 2, 1970.

Decided March 19, 1970.

Murry D. Brochin, Lowenstein, Sandler, Brochin & Kohl, Newark, N. J., for appellant.

Edward T. O'Donnell, Carpenter, Bennett & Morrissey, Newark, N. J. (Elmer J. Bennett, and John C. Heavey, Jr., Newark, N. J., on the brief), for appellees.

Before FREEDMAN, ALDISERT and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from an order of the district court for the District of New Jersey which granted summary judgment to the plaintiffs against the defendant Litton Industries and which denied Litton's cross-motion for summary judgment against the plaintiffs. A second defendant, Liberty Mutual Insurance Company, in whose favor summary judgment was entered against the plaintiffs, is not involved in this appeal. The case was removed from the Superior Court of New Jersey, Chancery Division, for diversity of citizenship. At least one claim asserted by the plaintiffs has not been fully adjudicated, but the district court, pursuant to Rule 54(b), Federal Rules of Civil Procedure, directed that final judgment be entered in favor of the plaintiffs, and the order is, therefore, appealable.

Plaintiffs are the trustees in liquidation of M-T Liquidation Corporation, a New Jersey corporation formerly known as McKiernan-Terry Corporation (hereinafter called M-T). Until September 21, 1962, M-T was engaged in the design, manufacture and sale of heavy machinery, including radar pedestals for the Defense Department's Distant Early Warning System, and arresting engines used to halt airplanes landing on carriers. On that date, pursuant to the terms of a contract dated July 12, 1962, defendant, Litton Industries, (hereinaf-

ter called Litton) acquired all of the assets, business and good will of M-T in exchange for Litton stock and the assumption by Litton of certain M-T liabilities. The disputed liabilities are in two categories:

1. The claim of General Electric Company against M-T for breach of contract because a number of radar pedestals furnished by M-T for the D.E.W. System failed to perform in accordance with contract specifications resulting in damage to G.E. This claim is in suit against both M-T and Litton.[1] The G.E. dispute had arisen prior to September 21, 1962, but it did not result in a lawsuit until November 14, 1966.

2. Two personal injury claims, both of which arise out of accidents which took place after September 21, 1962, and in both of which the accident is alleged to have been caused by the failure at sea of aircraft arresting engines made and sold by M-T in 1958. One claimant, Sevits, was injured on August 19, 1963. The other, Baldwin, was injured on September 12, 1964. Both claims have resulted in suits against M-T and Litton.[2]

At the time of the M-T to Litton closing on September 21, 1962, M-T was the insured under a comprehensive general liability policy issued by defendant, Liberty Mutual Insurance Company. The term of this policy was from November 1, 1961 to November 1, 1962. Apparently neither M-T nor Litton continued similar coverage after November 1, 1962. Plaintiffs sought in the complaint a declaratory judgment that Liberty Mutual insured against both the G.E. and the personal injury claims. The district court granted Liberty Mutual a summary judgment that it does not insure against the Sevits and Baldwin claims

---

1. General Electric Company v. M-T Liquidation Corporation, et al., Docket No. 66-CV-403, (N.D.N.Y.).

2. Lloyd M. Sevits v. McKiernan-Terry Corporation and M-T Liquidation Corporation, Civil Action File No. 883-65, (D.N.J.).

Lloyd M. Sevits v. McKiernan-Terry Corporation and M-T Liquidation Corporation, 65 Civil 1804, (S.D.N.Y.).

Joseph C. Baldwin v. M-T Liquidation Corporation, Civil Action File No. 923-66, (D.N.J.).

because the accidents arose after the expiration of the policy. M-T and Litton concede that this determination was correct, since product liability insurance coverage is written on the basis that the carrier on the risk at the time of the accident affords coverage.

The G.E. claim is being defended by Liberty Mutual pursuant to a reservation of rights agreement. The district court dismissed the complaint against Liberty Mutual without prejudice to the claim of M-T or Litton that Liberty Mutual is an insurer against the G.E. claim.

Plaintiffs' complaint and its motion for summary judgment against Litton sought a declaratory judgment that Litton is obliged to assume the defense of both the G.E. and the personal injury actions and to pay any judgment arising therefrom. Plaintiffs also sought injunctive relief and damages consistent with such a declaration. In support of its motion it filed affidavits which identified for the district court the M-T to Litton contract of July 12, 1962 and the exhibits thereto, the pleadings in the G. E. and the personal injury actions, and the assumption agreement which Litton furnished to M-T at the September 21, 1962 closing.

Litton filed no answering affidavits, but made a cross-motion for summary judgment in which it relied "upon the exhibits annexed to plaintiffs' notice of its pending motion for summary judgment."[3] Litton made these contentions:

1. The agreement between the parties is only an undertaking of indemnity and no liability arises on Litton's part until after M-T pays a judgment, and then only in the amount paid on account of the judgment.

2. Its liability on the G.E. claim is in the contract limited to $150,000.

3. It did not assume any liability to M-T with respect to product liability claims resulting from accidents occurring after the September 21, 1962 closing.

The district court rejected each of these contentions and entered a judgment that Litton is liable to M-T:

A. To defend and pay any judgment in the G.E. suit without limit, except to the extent that Liberty Mutual satisfies the same.

B. To indemnify M-T against any judgment in the personal injury actions, and to undertake the defense of these actions at Litton's expense.

C. To pay M-T all attorneys' fees and disbursements reasonably paid and incurred by M-T in defending these actions.

■ The M-T to Litton contract provides that it shall be construed and interpreted according to New York law. It is undisputed that the contract, although the subject of negotiations, is in the general form originally prepared by counsel for Litton. Litton's three contentions must, therefore, be determined under New York law, Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953); Tele-Controls, Inc. v. Ford Industries, Inc., 388 F.2d 48 (7 Cir. 1967); Barzda v. Quality Courts Motel, Inc., 386 F.2d 417 (5 Cir. 1967); Lebeck v. William A. Jarvis, Inc., 145 F.Supp. 706 (E.D.Pa.1956), modified, 250 F.2d 285 (3 Cir. 1957), and in the light of the fact that as the draftsman the agreement will be construed strictly against it. Mutual Life Ins. Co. v. Hurni Co., 263 U.S. 167, 44 S.Ct. 90, 68 L. Ed. 235 (1923); Rentways, Inc. v. O'Neill Milk and Ice Cream Co., 308 N. Y. 342, 126 N.E.2d 271 (1955); Broadway Realty Co. v. Lawyers' Title Ins. & Trust Co., 226 N.Y. 335, 123 N.E. 754 (1919); Janos v. Peck, 21 A.D.2d 529, 251 N.Y.S.2d 254, aff'd, 15 N.Y.2d 509, 254 N.Y.S.2d 115, 202 N.E.2d 560 (1964); Sklar Door Corp. v. Locoteta Homes, 33 Misc.2d 299, 224 N.Y.S.2d 294 (Sup.Ct.1961); City of New York v. Columbus Circle Apartments, Inc., 29 Misc.2d 763, 216 N.Y.S.2d 993 (Sup.Ct. 1961).

---

3. Litton's notice of motion filed February 5, 1968.

Two documents are involved, because at the September 21, 1969 closing, pursuant to a provision in the July 12, 1962 contract, a separate written undertaking respecting assumption of liabilities was furnished by Litton. Since, however, the language of this separate undertaking is identical in all material respects with the July 12, 1962 contract, we will refer hereafter only to the latter.

The contract is entitled Agreement and Plan of Reorganization, and it follows a familiar general outline for the acquisition of a going business. After setting forth the consideration flowing from each side (Section 1) and fixing a closing date (Section 2) it sets forth the representations and warranties of M-T (Section 3), and lists conditions precedent to Litton's obligation to close (Section 7). It provides for post-closing indemnification by M-T of Litton (Section 9) against and in respect of all liabilities of or claims against M-T not assumed by Litton pursuant to paragraph (d) of Section 1.

Section 1(a) sets forth the assets and business to be transferred by M-T. These include every conceivable tangible and intangible property and asset, including policies of insurance, and all cash on hand and in banks. Section 1(b) provides that Litton will deliver 27,500 shares of its stock for the M-T assets and business. Ten percent of the shares are by virtue of Section 1(c) subject to a one year holdback to secure the M-T indemnification agreement set forth in section 9.[4]

Besides delivering stock, Litton in Section 1(d) makes the undertaking with respect to liabilities which gives rise to this litigation. In this rather complicated provision [5] Litton under-

---

4. This provision was subsequently waived.

5. (d) *Assumption of Liabilities by Litton.* Litton will deliver to M-T an undertaking whereby Litton or its wholly-owned subsidiary, as the case may be, assumes and agrees to pay or discharge (i) all liabilities and obligations of M-T as of May 31, 1962, whether accrued, absolute, contingent or otherwise, to the extent, and only to the extent, that the same are reflected or reserved against in the financial statements as supplemented by Schedule C hereinafter referred to in paragraph (b) of Section 3 and have not been paid or discharged prior to the closing; (ii) all liabilities and obligations of M-T arising in the normal and ordinary course of its business between May 31, 1962 and the transfer date, except those referred to in clauses (a), (b) and (c) of following subdivision (iii) of this sentence; (iii) all liabilities and obligations of M-T in respect of the contracts and commitments referred to in paragraph (f) of Section 3, and all other contracts and commitments entered into in the regular and ordinary course of M-T's business at any time before or after May 31, 1962 and prior to the transfer date, except: (a) liabilities or obligations in respect of any contract or commitment of the character described in paragraph (f) of Section 3, but not listed in Schedules G, H, I, J and K; (b) liabilities or obligations in respect of any contract or commitment entered into by or on behalf of M-T between the date of this Agreement and the transfer date which are precluded by the provisions of paragraphs (d), (e) and (g) of Section 5 of this Agreement; (c) liabilities or obligations arising out of any breach by M-T, at any time before or after May 31, 1962 and prior to the transfer date, of any contract or commitment, unless and to the extent that such liabilities or obligations are reflected or reserved against in the financial statements of May 31, 1962 or set forth in the Schedules; and (iv) any and all liabilities and obligations set forth in the Schedules to this Agreement. Litton or its subsidiary, as the case may be, shall not assume or be liable for (i) any cost, expense or tax liability of M-T arising from or growing out of the sale and exchange provided for by this Agreement; (ii) obligations or liabilities to M-T's stockholders as such, including any obligation or liability to dissenting stockholders; (iii) any of the debts, liabilities or obligations of M-T (or costs and expenses in connection therewith) to the extent that such debts, liabilities or obligations shall be satisfied or paid on behalf of M-T by an insurer or insurers against such debt, liability or obligation under a policy issued to M-T. The assumption and agreement to pay and perform by Litton or its subsidiary of such debts, liabilities and obligations of M-T shall not preclude Litton or its subsidiary from contesting

takes four broad categories of liability. In Section 3 it receives, in turn, from M-T warranties and representations about the liabilities which it has undertaken. Section 7(a) makes it a condition precedent to closing that those representations be true at the time of closing, and Section 9 provides for post-closing indemnification of Litton by M-T against liabilities not assumed.

The first of the broad categories in Section 1(d) are financial statement liabilities. Annexed to the contract as an exhibit are financial statements as of May 31, 1962. In Section 1(d) (i) Litton undertakes "all liabilities of M-T as of May 31, 1962, whether accrued, absolute, contingent, or otherwise, to the extent, and only to the extent, that the same are reflected or reserved against in the financial statements as supplemented by Schedule C hereinafter referred to in paragraph (b) of Section 3. * * *" Section 3(b) (i) warrants that the May 31, 1962 financial statement "as supplemented by Schedule C fairly present the financial condition of M-T and the results of its operations as of the dates and for the periods stated and have been prepared in conformity with generally accepted accounting principles applied on a consistent basis with that of prior years. * * *"

Schedule C is entitled "Supplement to Financial Statements." It contains five typical financial statement footnotes detailing matters which would not ordinarily be clear from the bare figures in the financial statements. Among those notes is a reference to the dispute with G.E. over the allegedly defective radar mounts. After an explanation of the background of the dispute,[6] the note concludes:

in good faith any such debts, liabilities and obligations.

6. Supplement to Financial Statements of May 31, 1962: Schedule C
4. *General Electric Company (U. S. Air Force):*
Replacement of Seven Ball Bearings for Air Force AN/FPS–24 Radar Mounts On order from General Electric Company, McKiernan-Terry designed and manufactured a prototype AN/FPS–24 radar pedestal for the Air Force. On subsequent orders McKiernan-Terry has manufacturel eleven (11) additional FPS–24 radar pedestals.
The ball bearings for the pedestals were designed and manufactured by the Kaydon Engineering Corporation—Design life —10 years; minimum expected life—5 years. The first bearing in the prototype pedestal failed in 5,600 hours and the replacement bearing failed in 6,300 hours. The pedestal functions 24 hours per day, 8,760 hours per year.
Because of the early failure of these bearings, extensive investigation was conducted by the Air Force, General Electric, McKiernan-Terry and Kaydon Engineering Corporation. The reason for these failures: The ball path of the outer race did not meet hardness requirements. Because of the failures, all of the bearings in the eleven (11) production pedestals have been checked for hardness by the General Electric Company, McKiernan-Terry and Kaydon Engineering, metallurgists and engineers. The outer races of 6 bearings have been proved to be of insufficient hardness to give the expected life of 5 years.
The Air Force have ordered the General Electric Company to replace the 6 bearings which have soft outer races. General Electric has ordered McKiernan-Terry to replace the bearings and McKiernan-Terry has placed an order for 6 bearings with Kaydon Engineering Corporation. The quoted price of these bearings is $26,500. each.
Mr. Frank J. Donovan, president of Kaydon Engineering, in a conference held with General Electric and McKiernan-Terry on July 10, 1962 has agreed that when the replaced bearings are returned to Kaydon and are found to be of insufficient hardness, that the Kaydon Engineering Corporation will issue a credit for these bearings and make payment to McKiernan-Terry in full for the price paid for the bearings.
Copy of Mr. Donovan's letter of agreement is attached.
General Electric Company has agreed to stand the cost of removing the old bearings and installing the new ones. McKiernan-Terry is to furnish technical supervision for the removal and replacement. McKiernan-Terry is to design and furnish a replacement tool—total estimated cost—$30,000. This tool to be purchased by the Air Force.

The total maximum exposure in cost to McKiernan-Terry, providing Kaydon Engineering does not give McKiernan-Terry full credit for the returned bearings as they have agreed to do, is estimated to be not more than $150,000.

Litton relies on the language " * * * is estimated to be not more than $150,000" as placing an outside limit on its liability for the G.E. claim. It acknowledges that it did assume the G.E. liability at least to the extent of $150,000.

The second broad category of liabilities, assumed in Section 1(d) (ii), is "all liabilities and obligations of M-T arising in the normal and ordinary course of its business between May 31, 1962 and the transfer date * * *" that is, post-financial statement and pre-closing liabilities and obligations in the ordinary course of business. As with the financial statement liabilities, Litton received representations and warranties by M-T. In this case warranties were made against certain kinds of contracts (Section 3(f)), and provisions were made regulating the conduct of M-T's business until the closing (Section 5). Since neither the G.E. claim nor the personal injury claims arose in the ordinary course of business between May 31, 1962 and the closing, the assumption agreement in Section 1(d) (ii) is not relevant, except to the extent that it sheds light from the overall pattern of the agreement, on the intention of the parties.

The third broad category of liabilities, assumed in Section 1(d) (iii), is " * * * all liabilities and obligations of M-T in respect of the contracts and commitments referred to in paragraph (f) of Section 3, and all other contracts and commitments entered into in the regular and ordinary course of M-T's

business at any time before or after May 31, 1962 and prior to the transfer date. * * *" This undertaking is in two parts.

The "contracts and commitments referred to in paragraph (f) of Section 3" are a list of specific categories of ongoing contracts as to which in Section 3(f) M-T makes specific warranties. These are contracts such as purchase commitments, employment agreements, collective bargaining agreements and fringe benefits arrangements which would affect future operating results, but which would not ordinarily be reflected in a current financial statement. Section 3(f) lists eleven categories, and with respect to all but two the warranties are in absolute terms. One of these two provides:

(x) to the best of its knowledge and so far as it has any reasonable grounds to believe, M-T is not in default, nor is there any basis for any claim of default, under any contract made by it or obligation owned by it except as set forth in Schedule M.

There is no reference in Schedule M to the G.E. claim, but that claim, is as we pointed out heretofore, disclosed in detail in Schedule C. The personal injuries not yet having occurred, were not mentioned.

The second part of the Section d(iii) undertaking covers "all liabilities and obligations in respect of * * * all other contracts and commitments entered into in the regular course of M-T's business before or after May 31, 1962 and prior to the transfer date, * * *" The arresting engines, failure of which is alleged to have caused the personal injuries, were sold to the Navy in the regular course of M-T's business in 1958. M-T reads Section

---

The bearings which are to be removed and replaced have already been examined for requisite hardness and found to be deficient. It is on the basis of this finding, even on bearings not yet showing signs of distress, that the replacement is ordered to be made.

The total maximum exposure in cost to McKiernan-Terry, providing Kaydon Engineering does not give McKiernan-Terry full credit for the returned bearings as they have agreed to do, is estimated to be not more than $150,000.

1(d) (iii) as undertaking liability for product liability claims resulting from such sales but occurring after the closing. Litton contends for a narrower reading which would restrict the application of the clause to liability to contracting parties for breach of contract.

The fourth broad category of liabilities, assumed in Section 1(d) (iv), is " * * * any and all liabilities and obligations set forth in the Schedules to this Agreement." The G.E. claim is set forth in Schedule C. The personal injuries, not having occurred, are not set forth in any Schedule.

After setting forth these four categories of liabilities and obligations assumed, Section 1(d) expressly negates the assumption of " * * * any debts, liabilities or obligations of M-T (or the costs and expenses in connection therewith) * * * satisfied or paid on behalf of M-T by an insurer * * * under a policy issued to M-T." The inclusion of this limitation would seem to imply that the preceding language in the Section is broad enough to cover liabilities which are ordinarily insured against.

Finally, Section 1(d) concludes:

The assumption and agreement to pay and perform by Litton or its subsidiaries of such debts, liabilities and obligations of M-T shall not preclude Litton or its subsidiaries from contesting in good faith any such debts, liabilities and obligations.

The express inclusion of this language would seem to imply that the preceding language is broad enough to cover situations where the liability of M-T is both contested and uninsured.

Had the personal injuries occurred after May 31, 1962, the financial statements date, or after July 12, 1962, the contract date, or even after September 21, 1962, the closing date, but before November 1, 1962, the expiration date of the Liberty Mutual insurance policy, M-T would have been insured under its pol-icy, and Litton would have been covered by the express exception from the assumption agreement of liabilities and obligations satisfied or paid on behalf of M-T by an insurer. The crucial question, then, with respect to the personal injury claims, is which party bore the risk, after November 1, 1962, of carrying product liability insurance (or of self-insuring) to cover accidents involving products sold prior to that date.

## I. LITTON IS NOT MERELY AN INDEMNITOR.

■ Relying on Cornell v. Travelers' Ins. Co., 175 N.Y. 239, 67 N.E. 578 (1903) and De Angelis v. Smith, Sup., 95 N.Y.S.2d 52 (S.Ct.1949), Litton contends that the July 12, 1962 contract is an indemnity agreement, and that under New York law such an agreement does not impose an obligation to defend or to pay the cost of defending the indemnitee against disputed claims; rather, the indemnitor's duty to pay arises only when the indemnitee's liability has become fixed by a judgment against the indemnitee. In a sufficiently narrow class of cases this undoubtedly is the law of New York. But those cases depend on specific language quite unlike that in the M-T to Litton contract. New York recognizes a distinction between indemnity against loss and damage only, and indemnity against liability. Schneck v. Lewis, 121 Misc. 370, 201 N.Y.S. 282, 287 (Sup.Ct.1923), aff'd, 210 App.Div. 845, 206 N.Y.S. 958 (1924). In the latter case, at least, New York follows the general rule that an indemnitee is entitled to recover as a part of his damages reasonable attorneys fees and proper legal costs and expenses he has been compelled to pay as a result of suits against him with respect to matters against which he is indemnified. In re Campbell's Estate, 176 Misc. 543, 27 N.Y.S.2d 831 (Surr.Ct.1941). Possibly when the contract is drawn narrowly enough the latter right arises only with respect to the defense of cases resulting in liability. Cornell v. Travelers' Ins. Co., *supra.*

■ Here, however, in the context of the entire agreement, the contention that Section 1(d) should be read as an indemnity contract only, is wholly unmeritorious. This was a contract for the purchase of the entire assets and business of M-T, with the clear intention of carrying that business forward. The consideration for the purchase was stock of the purchaser, Litton, and the purchaser's undertaking to go forward with that business. Litton undertook to pay those liquidated and uncontingent liabilities which appeared on M-T's balance sheet, and to perform those business commitments which remained unliquidated and contingent. If the liabilities in dispute were undertaken, they were undertaken by assumption and not merely by way of indemnification. The language "assumes and agrees to pay or discharge" is equally applicable to all four broad categories of liabilities and obligations, and there is no more reason to read those words as mere indemnity undertakings when applied to the claims disputed here than when applied to the purchase orders, employment contracts, or other unliquidated liabilities and obligations of M-T which quite clearly were to be performed. Defense of suits, meritorious or groundless, was an obvious incident to the performance of ongoing contracts. If the disputed claims were assumed by Litton, they were assumed in the same manner as Litton assumed the balance of M-T's business obligations. The language of the contract is that of assumption not of indemnification.

This case is controlled not by Cornell v. Travelers' Ins. Co., *supra*, and De Angelis v. Smith, *supra*, but by Chase v. Brandis, 238 App.Div. 440, 264 N.Y.S. 509 (1933); State Bank of Avon v. Sheldon, 130 Misc. 64, 223 N.Y.S. 634 (Sup.Ct.1927); and Mann v. Ferdinand Munch Brewery, 225 N.Y. 189, 121 N.E. 746 (1919). These cases hold that one who assumes a liability, as distinguished from one who agrees to indemnify against it, takes the obligation of the transferor unto himself, including the obligation to conduct litigation.

## II. LITTON DID NOT LIMIT ITS LIABILITY ON THE G.E. CLAIM to $150,000.

■ The parties agree that Litton assumed liability for the G.E. claim at least to the extent of $150,000. Litton contends that the July 12, 1962 contract limited its liability to this amount, because Section 1(d) (i) limited its undertaking to "all liabilities and obligations of M-T as of May 31, 1962, whether accrued, absolute, contingent or otherwise, to the extent, and only to the extent, that the same are reflected or reserved against in the financial statements as supplemented by Schedule C. * * *" It points to the words "to the extent, and only to the extent" as referring to a dollar limitation, and to the $150,000 estimate in Schedule C as, therefore, a binding limitation.

Section 1(d) (i) cannot, in the context of the entire Section, or indeed of the entire clause, be read this way. As was pointed out hereinabove, Section 1(d) (i) refers to financial statement liabilities, and is coupled with a warranty (Section 3(b) (i)) that these statements have been prepared in conformity with generally accepted accounting principles. The G.E. claim was on May 31, 1962 unliquidated in amount, and it still is. It could not appear in the financial statements in a dollar amount. To the extent that the claim could be disclosed it was.[7] The number of defective radar pedestals, the alleged defects, the procedure necessary for correction, and a possible claim against a subcontractor all were disclosed in Schedule C. The note in the Schedule concluded with an estimate of $150,000. If it could have been more than an estimate the figure would have

**7.** Committee on Auditing Procedure of the American Institute of Certified Public Accountants, Statements on Auditing Procedure, Bull. No. 33, Ch. 9. § 2 (1965).

been reflected in the financial statements and not in a note. The note cannot be read as anything more than an estimate of the possible scope of an unliquidated liability otherwise fully disclosed.

### III. LITTON ASSUMED THE RISK OF PRODUCT LIABILITY CLAIMS ARISING FROM ACCIDENTS AFTER THE CLOSING.

■ The progression in Section 1(d) is from liquidated financial statement liabilities to unliquidated but known liabilities, to post-contract but pre-closing liabilities arising in the normal and ordinary course of business, to liabilities and obligations, now undetermined, arising out of contracts and commitments listed in Section 3(f), and finally to liabilities and obligations "in respect of * * * all other contracts and commitments entered into in the regular and ordinary course of M-T's business."

This progression is appropriate for the assumption of the ongoing obligations of a going business, and the language "in respect of * * * all other contracts and commitments" could hardly have been broader. Moreover, in the same agreement all insurance policies, including a product liability insurance policy, the term of which extended past the closing date, were transferred by M-T to Litton. Clearly the parties envisioned that the risk of insuring against claims arising from future accidents was one which was assumed by the party carrying on the transferred business.

Litton contends that the foregoing reading of Section 1(d) (iii) is prohibited because of an express exception to that clause of "liabilities or obligations arising out of any breach by M-T * * * of any contract or commitment, unless and to the extent that such liabilities or obligations are reflected or reserved against in the financial state-

ments of May 31, 1962 or set forth in the Schedules." It contends that the district court should have awaited the outcome of the product liability trials to see whether or not the result turned on breach of warranty (contract and hence excluded) or negligence or strict liability. There is no merit in this contention. The product liability claims could not have been reflected in the financial statements or set forth in the Schedules, since the accidents had not yet occurred. The quoted exception to Section 1(d) (iii) refers to matters which had arisen, were known, and could have been reflected or set forth. This reading of the exception is consistent with the warranty in Section 3(c) (ii), that M-T does not know of any basis for the assertion against it of any liability not reflected, reserved against, or disclosed, for if the exception were as broad as Litton contends, this warranty would be surplusage.

The only facet of the agreement to which Litton can point with even slight comfort in support of its contention that it did not assume the obligation to insure against or pay the product liability claims is the absence of an express reference in the contract to such claims arising from future accidents. That absence is not significant. The draftsman throughout referred to broad categories of liabilities, not to narrow specifics. There is no specific listing of "all liabilities and obligations of M-T in respect of * * * all other contracts and commitments entered into in the regular and ordinary course of M-T's business." The clause refers to a number of such matters which might have been, but were not specifically listed. Product liability claims from future accidents are one such matter. They became the problem of the party conducting the ongoing business.

The order of the district court will be affirmed.