**In re John DONATO, Jr., Debtor.**

**Bankruptcy No. 94–33838.**

United States Bankruptcy Court,
D. New Jersey.

July 22, 1994.

250

Timothy P. Neumann, Wood, Broege, Neumann & Fischer, Manasquan, NJ, for debtor.

Richard K. Matanle, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, NJ, for Federal Deposit Ins. Co.

Kevin G. Smith, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for Principal Mut. Life Ins. Co.

Gary Eisenberg, William S. Katchen, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for United Jersey Bank & United Jersey Bank/Central, N.A.

Vincent F. Papalia, Clapp & Eisenberg, Newark, NJ, for MBL Life Assurance Co.

Jeffrey L. Love, Beattie Padovano, Montvale, NJ, for Confederation Life Ins. Co.

Joseph E. Sales, Norris, McLaughlin & Marcus, Somerville, NJ, for Starbare II Partners, L.P.

## MEMORANDUM OPINION

KATHRYN C. FERGUSON, Bankruptcy Judge.

### FACTUAL BACKGROUND

**John Donato, Jr.,** d/b/a Mid Atlantic Industrial Co., filed this chapter 11 case on June 5, 1994. The debtor owns and operates fourteen separate commercial real estate properties, and has moved to use the rents derived therefrom as cash collateral. Two secured creditors, Starbare II L.P. and Principal Mutual Life Insurance Company, have entered into consents allowing the debtor to continue to use the rents derived from the mortgaged properties.

United Jersey Bank, Mutual Benefit Life Assurance Company, and Confederation Life Assurance Company have objected to the debtor's use of the rents as cash collateral. Eight of the debtor's fourteen properties are encumbered by the three objecting creditors.

**United Jersey Bank ["UJB"]** and the debtor executed three separate loan transactions as follows:

Note # 1      Loan Amt. $935,000.00      Dated: 8/12/87
Secured by 1 Corbett Way (the "Eatontown Property"), Eatontown, New Jersey. Mortgage modified on September 1, 1990 and as a part of the modification the debtor executed collateral assignment of leases to UJB.
Note # 2      Loan Amt. $200,000.00      Dated: 7/12/91
Second mortgage on the Eatontown property.
Note # 3      Loan Amt. $8,490,000.00      Dated: 1/24/89
Secured by 72 James Way (the "Meridian Property"), Eatontown, New Jersey and by 585 Shrewsbury Ave., Shrewsbury, New Jersey.[1]

The notes all matured on December 31, 1993. UJB instituted foreclosure proceed-

---

1. The Shrewsbury property is owned by Donato Construction, a corporation whose principal shareholder is the debtor.

ings, and on May 3, 1994, obtained the appointment of a receiver to collect the rents and operate the properties.

**MBL Life Assurance Corp.** ["**MBL**"] holds three notes from the debtor, which are secured by various properties as follows:

Note # 1          Loan Amt. $3,420,000.00         Dated: 6/1/88
Secured by 20 & 22 Meridian Road, Eatontown, NJ as well as a collateral assignment of leases.

Note # 2          Loan Amt. $6,000,000.00         Dated: 6/29/89
Secured by Cranberry Commons, 442–446 Rt. 35, Eatontown, NJ as well as an assignment of leases.

Note # 3          Loan Amt: $4,185,000.00         Dated: 4/9/85
Secured by 2 Industrial Way West, Eatontown, NJ as well as collateral assignment of lessor's interest in leases (loan was originally made to CJ Development—property was conveyed with mortgage to debtor, then to debtor's wife, then back to debtor).

On March 10, 1994, the debtor and MBL entered into a Consent Order providing for the appointment of a receiver for the properties. The Consent Order states that the rents had been unconditionally and absolutely assigned to MBL and provides that the receiver will collect the rents and pay all obligations of the properties. Thereafter, on May 11, 1994, the debtor and MBL entered into a Consent Final Judgment of Foreclosure.

**Confederation Life Assurance Company** ["**Confederation**"] executed a single loan transaction with the debtor as follows:

Loan Amount $7,800,000.00 Dated: 9/28/90 Secured by mortgage on 51 James Way and 6 Industrial Way, Eatontown, New Jersey as well as a separate Assignment of Rents and Leases.

Confederation instituted a mortgage foreclosure action, and on March 2, 1994, obtained the appointment of a receiver for the property.

## ANALYSIS

11 U.S.C. § 363(a) defines cash collateral as "cash ... or other cash equivalents ... in which the estate and an entity other than the estate have an interest." It is undisputed that the rents are cash or cash equivalents in which the objecting creditors have an interest. The debtor's motion requires this court to determine whether a mortgagor/debtor has an interest in rents derived from the mortgaged property following the appointment of a rent receiver. The objecting creditors all contend that the debtor no longer held any interest in the rents as of the date of the filing and thus the rents never became property of the estate.

Two prominent cases from this district have addressed the rents issue. Neither *Midlantic National Bank v. Sourlis,* 141 B.R. 826 (D.N.J.1992) nor *In re Princeton Overlook Joint Venture,* 143 B.R. 625 (Bankr. D.N.J.1992), however, completely resolve the issue presented here. *Sourlis* dealt with the question of whether rents constituted cash collateral, but focused on what actions, if any, a secured creditor must take to have its security interest in rents continue post-petition. The court held that upon recordation of a mortgage containing an assignment clause, the creditor had a perfected interest in the rents which continued post-petition. Because the *Sourlis* court assumed that the debtor had an interest in the rents and focused on the nature of the *creditor's* interest, its holding is not dispositive of the nature of the *debtor's* interest.

The court in *Princeton Overlook* applied the *Sourlis* standard to determine that the creditor's interest was perfected, and read the assignment clause to be an absolute assignment of rents vesting title in the secured creditor. The secured creditor had not obtained the appointment of a receiver, however, and the debtor retained the right to collect the rents. Since the debtor held a pos-

sessory collection interest in the rents, they became cash collateral under § 363(a).

There is no dispute that the three secured lenders here had properly recorded their assignments or that a receiver had been appointed in each instance. That is, there is no allegation that the creditors failed to perfect their interests or that the debtor had a possessory interest in the rents. The issue presented here goes one step beyond *Sourlis* and *Princeton Overlook:* when a creditor has properly recorded an assignment and taken possession of rents, does the debtor retain an interest that brings the rents within the definitions of property of the estate and cash collateral?

■ Section 541 of the Code defines property of the estate to include "all legal and equitable interests of the debtor in property as of the commencement of the case". 11 U.S.C. § 541(a)(1). Interests in property are determined by state law. *See, Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Therefore, the court must determine whether the debtor had any interest in the rents under New Jersey law at the time the debtor commenced its case.

Judge Debevoise addressed this issue in an unpublished opinion in *Matter of Glen Properties,* 168 B.R. 537 (D.N.J.1993). Judge Debevoise held that if the debtor had any interest in the rents at the commencement of the case, then the rents would be cash collateral under § 363(a). In determining whether the debtor had such an interest, Judge Debevoise looked to the language of the assignment. He concluded that the bankruptcy court had correctly determined that the language created an absolute assignment, which transferred title of the rents to the secured creditor, and was therefore more than a mere lien on the rents. In addition, Judge Debevoise found that since a receiver had been appointed prior to the filing of the bankruptcy petition, the debtor no longer had a possessory interest in the rents. Since the debtor had neither a legal nor possessory interest in the rents, they were not property of the estate and were not cash collateral.

For entirely different reasons, both the debtor and one of the objecting creditors argue that, notwithstanding *Glen Properties,*

New Jersey law does not require this court to address itself to the specific language of the applicable assignment. United Jersey Bank argues that the specific language of the assignment is not controlling, citing *Commerce Bank v. Mountain View Village, Inc.,* 5 F.3d 34 (3d Cir.1993) for the proposition that title to assigned rents passes upon the debtor's default and enforcement by the mortgagee, and *Stewart v. Fairchild–Baldwin Co.,* 91 N.J.Eq. 86, 108 A. 301 (E. & A.1919) for the proposition that upon default by the mortgagor, "the mortgagee's estate has all the incidents of common law title". UJB contends that *Stewart* establishes that New Jersey is a "title theory" state and thus the *Commerce Bank* case should bind in New Jersey as well as Pennsylvania.

■ The New Jersey Supreme Court, however, recently reaffirmed that New Jersey follows a lien theory of mortgages. The Court stated:

> The common law in New Jersey holds that a mortgagee is entitled to possession of the mortgaged premises on default of the loan secured by the mortgage. Except for that common-law entitlement, New Jersey follows a "lien" as opposed to a "title" theory of mortgages. Execution of the mortgage does not convey to the mortgagee title that is defeasible on payment of the secured debt, but rather confers on the mortgagee a lien on the property that secures the debt. Thus, on default, the mortgagee only has a possessory interest, and ownership of the premises remains subject to the mortgagor's equity of redemption.

*Chase Manhattan Bank v. Josephson,* 135 N.J. 209, 217–18, 638 A.2d 1301 (1994) (internal citations omitted).

Both the *Josephson* and *Stewart* cases involved foreclosure actions on a mortgage without an independent assignment of rents. The New Jersey Supreme court's language in *Josephson* at least implicitly overrules the language cited by UJB from the *Stewart* case and establishes that New Jersey is a "lien theory" state. The holding in the *Commerce Bank* decision pertains only in title theory jurisdictions, and accordingly does not dictate a result in this case.

UJB also argues that the language of the assignment is irrelevant because a mere pledge of rents coupled with the default of the debtor and the appointment of a receiver divests the debtor of any interest in the rents. In support of its position, UJB cites the Court to *Stanton v. Metropolitan Lumber Co.*, 107 N.J.Eq. 345, 152 A. 653 (N.J.Ch. 1930) and *In re Weiss,* 66 F.2d 428 (3d Cir.1933). The Court in *Stanton* held that title to the rents had been assigned to the creditor upon the debtor's default. However, the court in *Stanton* based its decision on a reading of the assignment clause in the mortgage. The *Weiss* Court held that a conditional assignment became absolute following the debtor's default. Again, however, the Court based its decision on a reading of the assignment clause found in the bond and mortgage. Neither case stands for the unvarnished proposition that the debtor loses title upon the appointment of a receiver regardless of the language of the assignment.

The debtor correctly posits that New Jersey is a "lien theory" state. For that reason, the debtor also contends that the specific language of the assignment is irrelevant. The debtor insists that viewed in context, all assignments executed in connection with financing agreements must be construed as security agreements even where the document clearly and unequivocally purports to transfer title. The debtor has not cited any authority for this proposition. In each of the cases analyzing the debtor's interest in rents cited, the court looked to the language of the assignment at issue.

While the debtor's argument that such assignments must necessarily have been intended as additional security for the underlying financing carries a certain intuitive force, it also makes sense that the parties executed an "Assignment" rather than a "Security Agreement" for a reason. The language of the assignment may not be determinative, particularly where the language is ambiguous, but it is certainly evidence of the parties intentions. Accordingly, this court will look to the specific language of the Assignment carefully to determine whether the debtor retains an interest in rents. Absent unequivocal and unambiguous language reflecting that the parties intended to transfer title to the rents, such assignments will be construed as granting the assignee merely a security interest.

This holding is consistent with the Seventh Circuit's decision in *In re Century Investment Fund VIII Ltd. Partnership* 937 F.2d 371 (7th Cir.1991). The *Century Investment* court noted that Wisconsin, like New Jersey, follows a lien theory of mortgages and thus the "general rule in Wisconsin [is] that the mortgagee does not have the right to the rents and profits, even though they have been assigned, until he gains actual or constructive possession or until a receiver is appointed." *Id.* at 376. The court noted an exception to the general rule, however, and held that "immediate transfer of the assignment of rents on default ... is enforceable, albeit only when it is the clearly expressed intention of the parties." *Id.* at 377. While the law in Wisconsin is apparently somewhat more developed on the question of rents than the law in New Jersey, the Seventh Circuit's decision to review the specific contractual language of the assignment in a lien theory jurisdiction translates nicely.

## MBL'S ASSIGNMENT/CONSENT ORDER APPOINTING RECEIVER/CONSENT JUDGMENT OF FORECLOSURE

MBL also urged that the language of its assignment was not relevant, but based its argument on the entry of the Consent Order Approving the Appointment of the Receiver ["Consent Order"] and the Consent Judgment of Foreclosure ["Consent Judgment"]. Both of these documents were executed pre-petition. To the extent that they supersede the assignment in determining the parties respective rights to the rents on the date the debtor filed its petition, the Court will examine these documents to determine whether the debtor retained an interest in the rents.

Paragraph A.1. of the Consent Order states:

Any and all past, present or future leases of all or any portion of the Mortgaged Properties, and all rents, income, proceeds, issues and profits arising therefrom and

collected with respect to the Mortgaged Properties . . . have been **unconditionally and absolutely** assigned to Mutual Benefit. . . .

See Exhibit L to Certification of Phillip Romano (emphasis added).

No. other language in either the Consent Order or the Consent Judgment even hints that the transaction was intended to be anything other than a transfer of title. Based on the above quoted language, the Court finds that the debtor had no interest in the rents at the commencement of the case. The debtor transferred any interest it may have held in the rents under the terms of the Consent Order. On the date it filed its petition, the debtor had neither a possessory interest nor any remaining legal interest in the rents, and therefore the rents did not become property of the estate and are not cash collateral.

■ The debtor contends that the Third Circuit's holding in *Midlantic National Bank v. DeSeno*, 17 F.3d 642 (3d Cir.1994), enables the debtor to modify the Consent Judgment. Since the debtor may modify the foreclosure judgment, it argues, the debtor retains an interest in the property and therefore an interest in the rents. The debtor acknowledged at oral argument, however, that rents could be sold or transferred independent of ownership rights. Thus, retaining an interest in the property does not necessarily guarantee that a party retains an interest in the rents.

In view of this holding, the court will not require the receiver to turnover the rents under § 543.

## CONFEDERATION'S ASSIGNMENT

■ The fourth unnumbered paragraph of Confederation's assignment states:

[I]n order to induce the Assignee to make the Loan to the Assignor and (a) to secure the payment of the "Indebtedness" . . . and (b) to secure the performance by the Assignor of all other obligations and covenants of the Loan Documents, the Assignor, for good and valuable consideration, the receipt of which is hereby acknowledged, does hereby bargain, sell, transfer, assign, convey, set over and deliver unto Assignee all right, title and interest of the Assignor in, to and under any and all leases, whether presently existing or hereafter entered into, . . . and all amendments, extensions and renewals of said leases, . . . and all rents, income and profits which may now or hereafter be or become due or owing under the Leases, and any of them, or on account of the use of the Premises.

See Exhibit A to Certification of Jeffrey Love.

Portions of the above-quoted paragraph appear to convey title to the rents to Confederation. In addition, Paragraph # 2 of the Assignment states "This Assignment is absolute and effective immediately." However, the first two sentences of the assignment just as clearly indicate that the assignment is not absolute and the parties intended the assignment to act as security for the loan to the debtor.

■ When construing an ambiguous document, the court must construe the document against the party who drafted the document. See *Bouton v. Litton Industries, Inc.*, 423 F.2d 643 (3d Cir.1970). The assignment was prepared by Confederation and therefore this court must construe the assignment against Confederation. Based on the foregoing, this court finds that the assignment between John Donato, Jr. and Confederation was not intended to be an absolute assignment and did not convey title to the rents to Confederation. The assignment only created a security interest in the rents and the debtor retained an interest in the rents on the date it filed its petition. The rents became property of the estate and are cash collateral.

■ The debtor has certified that the fair market value of the two properties encumbered by Confederation's mortgages is approximately $9,850,000.00. The debtor's certification indicates that Confederation is owed approximately $7,656,907.00. Thus, according to the debtor's certification, there is approximately $2,192,093 worth of equity in the two properties. Confederation has not presented any evidence regarding the value of the two properties. In light of the evidence of a substantial equity cushion, the

debtor has met its burden of showing that Confederation is adequately protected pursuant to § 363(*o*)(1). Based on this finding, the debtor is authorized to use the rents derived from 51 James Way and 6 Industrial Way properties in the ordinary course of its business.

■ Confederation also argues that its receiver should be relieved from compliance with § 543. Confederation has not presented any evidence to support a finding that allowing its receiver to remain in place would benefit the interests of creditors. In the absence of any such evidence, the Court orders the receiver for the 51 James Way and 6 Industrial Way properties to turnover the rents in compliance with 11 U.S.C. § 543.

## UJB'S SEPTEMBER 1, 1990 COLLATERAL ASSIGNMENT OF LEASES

■ The September 1, 1990 Collateral Assignment of Leases states in pertinent part:

[T]he Assignor for good and valuable consideration, receipt of which is hereby acknowledged, hereby grants, transfers and assigns to the Assignee the entire lessor's interest in and to those Leases ... as shown on Exhibit A, now existing and pertaining to tenants at those certain premises owned by Assignor;

.    .    .    .    .

Together with all rents, income and profits arising from said Leases and renewals thereof; together with all rents, income and profits for the use and occupation of the premises described in said Leases or in the Mortgage hereinafter referred to and, at the option of the Assignee, from all Leases upon said premises which may be executed in the future during the time of this assignment;

.    .    .    .    .

THE ASSIGNMENT is made for the purpose of securing:

A. The payment of the principal sum, interest and indebtedness ...

B. Payment of all other sums with interest thereon becoming due and payable to Assignee ...

C. The performance and discharge of each and every obligation, covenant and agreement of the Assignor ...

The paragraphs quoted above contain contradictory language. The first paragraph seems to absolutely assign all of the lessor's interest in the leases to UJB. However, the stated purpose of the assignment is to secure the repayment of the loan made to the debtor.

To help clarify whether the assignment was meant to transfer title of the rents or whether it was only intended as additional security for the loan, the court will compare the language in UJB's assignment with the assignment provisions from both the *Princeton Overlook* and *Glen Properties* decisions. The assignments in both of those cases exhibit an unequivocal intent to transfer title to the rents to the lender. In *Princeton Overlook,* for example, the assignment clause stated, "it being intended by Borrower and Lender that this assignment of rents constitutes an absolute assignment and not an assignment for additional security only." *Princeton Overlook* at 631. In *Glen Properties,* the assignment transferred title to the lender and granted the debtor a revocable license to collect the rents. Upon the debtor's default, the license was revoked and the debtor retained no legal interest in the rents. The language in UJB's assignment is not nearly as surefooted.

Based on the contradictory language in the assignment, the Court finds that the September 1, 1990 collateral assignment of leases gave UJB only a security interest in the rents. The debtor retained an interest in those rents on the date the debtor filed its petition and the rents constitute cash collateral.

■ The debtor has certified that the 1 Corbett Way property has a fair market value of $1,870,000. UJB contends the amount due and owing under the first mortgage is approximately $872,000 and approximately $200,000 under the second mortgage. UJB has not presented any evidence of the value of the property. Based on the evidence of a substantial equity cushion, the debtor has met its burden of showing that

UJB is adequately protected pursuant to § 363(*o*)(1).

## UJB'S JANUARY 24, 1989 ASSIGNMENT OF DEBTORS INTEREST IN LEASES

■ UJB's January 24, 1989 assignment contains almost identical language to that found in the September 1, 1990 assignment. The assignment states:

> For value received, Assignor hereby grants, transfers and assigns to the Assignee the following leases, hereby warranting that the Assignor is the owner of the entire Lessor's interest therein ...;
>
> .    .    .    .    .
>
> Together with all rents, income and profits arising from said leases and renewals thereof, if any, and together with all rents, income and profits due or to become due from the premises hereinafter described and from all leases for the use and occupation of the said premises which are now in existence or which may be executed in the future during the term of this Assignment;
>
> *FOR THE PURPOSE OF SECURING:*
>
> 1.  Payment of the indebtedness ...
>
> 2.  Payment of all other sums with interest thereon becoming due and payable to Assignee ...
>
> 3.  The performance and discharge of each and every obligation, covenant and agreement of the Assignor ...

The January 24, 1989 assignment, much like the September 1, 1990 assignment, failed to convey title of the rents to UJB. The first paragraph simply states that the assignor "grants, transfers and assigns" the following leases to the assignee. The assignment then indicates its purpose is to **secure** the loan obligations.

Based on the foregoing, the Court finds that the January 24, 1989 collateral assignment of leases gave UJB only a security interest in the rents. The debtor retained an interest in those rents on the date the debtor filed its petition and the rents constitute cash collateral.

■ The debtor has certified that the 72 James Way property has a fair market value of $1,473,000. UJB contends it is owed approximately $2,246,000 on its mortgage but has not presented any evidence as to the value of the property. Based on the evidence, the Court finds that there is no equity cushion to serve as adequate protection for the use of UJB's collateral.

■ The use of cash collateral to pay the operating expenses of the real property in question adequately protects the interest of secured lenders, however, even where the creditor is undersecured. *See e.g., In re Pine Lake Village Apartment Co.,* 16 B.R. 750, 756 (Bankr.S.D.N.Y.1982); *In re Willowood East Apartments of Indianapolis,* 114 B.R. 138, 143–144 (Bankr.S.D.Ohio 1990); *In re 499 W. Warren Street Assoc., Ltd.,* 142 B.R. 53, 56 (Bankr.N.D.N.Y.1992). The debtor will accordingly be permitted to use the rents to pay the operating expenses of this property. Without an equity cushion or some other form of adequate protection, however, the Debtor cannot use the rents from the 72 James Way property to maintain other properties or for its general operating expenses.

## UJB'S MOTION TO EXCUSE COMPLIANCE WITH § 543

■ Finally, UJB has moved to allow GNK Realty Corporation remain in place as receiver for the subject properties. UJB contends that the debtor has mismanaged the properties, and therefore it is in the best interest of creditors that GNK continue to serve as receiver.

UJB presented the testimony of Neil Betoff, the President of GNK, in support of the motion to excuse compliance with § 543. Mr. Betoff testified that problems existed at the properties at the time of GNK's appointment: the parking lots had lighting and drainage problems, and needed line painting; the buildings had some minor roof leakage; tenants were complaining about signage; landscaping had not been maintained; a number of the tenants were behind in their rents; the debtors bookkeeping system fell

far short of the state of the art system implemented by the receiver.

As further evidence of mismanagement, UJB has alleged that the debtor converted rents belonging to UJB tendered in connection with a settlement with Ronstan Paper Co. ["Ronstan"]. The debtor released Ronstan, the only tenant at the Meridian property, from its obligations under a lease in exchange for a $100,000.00 payment and the offset of $39,000.00 due to Ronstan from Donato Construction. The debtor did not turn these funds over to UJB after the receiver was appointed or even disclose that such release had been negotiated. UJB contends that the debtor's failure to turn over the monies paid on account of future rents constitutes a conversion which, combined with other evidence of mismanagement, warrants continuation of the receiver.

In response, the debtor has certified that one of the primary reasons he was forced into Chapter 11 was that several of his tenants had filed for bankruptcy protection themselves. The debtor contends that he made accommodations to allow certain tenants to pay rent in light of their own economic difficulties. He contends that in the current commercial real estate market, a landlord must be flexible and must adjust to economic forces. The debtor claims that he released Ronstan from its lease because Ronstan believed its lease had terminated and was withholding rent and threatening to vacate the premises. The debtor contends that in order to prevent litigation and to insure that Ronstan would remain a tenant, he settled the dispute by allowing Ronstan a release from its lease. The debtor understood the payment from Ronstan to be on account of prior rent arrearage. Since the debtor had made its payments to UJB despite Ronstan's past defaults, it used the payment curing those defaults in the ordinary course of its business.

▮▮▮▮ UJB has failed to meet its burden of showing that the debtor has mismanaged the properties to the extent that the receiver should remain in place. Although the decision can be questioned in hindsight, the debtor's choice to be flexible when collecting rents was an exercise of business judgment. The decision to release Ronstan from its obligations under the release was not patently unreasonable in view of the threatened litigation. The fact that the debtor allowed certain tenants to pay rent according to their ability and allowed minor repairs to go uncompleted in times of financial hardship does not constitute sufficient cause to excuse compliance with § 543: under that standard, there would be virtually no commercial landlord eligible for turnover under § 543. While the court is somewhat troubled by the debtor's explanation for use of the Ronstan release funds, the Court is not willing to find on the basis of the record as it currently exists that the debtor converted rents belonging to UJB.

Counsel for the debtor is directed to submit a form of order comporting with this opinion.