HOWARD M. SCHOOR, ASSOCIATES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, AND SCHOOR ENGINEERING, INC., A CORPORATION OF THE STATE OF NEW JERSEY, APPELLANTS, v. HOLMDEL HEIGHTS CONSTRUCTION COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT, AND ALLAN (ALAN) SUGARMAN, RESPONDENT.

Argued April 14, 1975—Decided July 14, 1975.

*Mr. Michael K. Fielo* argued the cause for appellants. (*Messrs. Fielo and D'Alessio,* attorneys; *Mr. Fielo* on the brief).

*Mr. Theodore W. Geiser* argued the cause for respondent (*Messrs. McElroy, Connell, Foley and Geiser,* attorneys; *Mr. Geiser* of counsel; *Mr. Richard D. Catenacci,* on the brief).

The opinion of the Court was delivered by

MOUNTAIN, J. Plaintiffs, two engineering and surveying firms with identical or very similar management and ownership, brought this action to recover amounts due for professional services rendered by them to defendant, Holmdel Heights Construction Company. The latter is in receivership

and the suit has proceeded, in effect, solely against defendant, Alan Sugarman. Plaintiffs' claim is that Sugarman, an attorney at law of this state, personally undertook to pay for the services rendered. He defends on the factual ground that he made no promise to do so and upon the legal ground that even had he made such a promise, it would be unenforceable under the Statute of Frauds.

The trial judge, sitting without a jury, resolved both the factual and legal issues in favor of plaintiffs and entered judgment against defendant in the amount of $24,105.30, together with interest. On appeal to the Appellate Division the judgment was reversed, with one judge dissenting. Plaintiffs have appealed to this Court as a matter of right. *R.* 2:2–1(a) (2).

Holmdel Heights Construction Company was in the process of developing a tract of land upon which it was constructing homes. Defendant, Sugarman, owned slightly more than 18% of the capital stock of this corporation and at all relevant times acted as its attorney. Plaintiff corporations were engaged to do surveying, engineering and professional planning work in connection with the development. The amount of their fees was not fixed by agreement but there has never been any dispute as to the reasonableness of their charges. Some of the invoices they submitted to the developer were paid, but others were not. The total of these unpaid charges continued to increase and plaintiffs became concerned.

On April 14, 1970 an important conference took place in the office of Mr. Sugarman. In addition to Mr. Sugarman there were also present at this meeting Howard M. Schoor, president of the plaintiff corporations, and Lawrence Schwartz, Esq., their attorney. The question of plaintiff's unpaid bills was a principal subject of discussion. Both Mr. Schoor and Mr. Schwartz testified that at this meeting Mr. Sugarman agreed personally to pay all outstanding bills as well as any charges that might be incurred in the future, if plaintiff would continue with the work they were doing. The developer, Holmdel Heights Construction Company,

was then busily engaged in seeking additional financing. Everyone concedes that in order to secure this financing, it was essential that further engineering work be done at once. Mr. Sugarman drew a check on his trust account for $2,000 and gave it to Mr. Schoor. According to the latter, the delivery of the check was accompanied by a statement made by Mr. Sugarman that this was intended to show his good faith in giving his personal guaranty as to payment of the outstanding and continuing obligation. On redirect examination Mr. Schoor again stated,

At the April 14th meeting Mr. Sugarman very pointedly said that the corporation had no money at this time and was giving me his own money to attempt to satisfy me and have us continue to work on the project.

The testimony of Mr. Schwartz was substantially the same.

Defendant disagreed as to the purport of the conversation. His recollection was that after indicating the corporation's lack of liquidity, he gave Schoor the check for $2,000, indicating that that was the best the corporation could do at that time and that as further funds were received by it, additional payments would be made. At about this period Sugarman seems to have been actively managing many of the corporation's financial affairs; large amounts of corporate funds passed through his trust account.

Schoor and Schwartz left the meeting apparently satisfied, and the needed engineering work went forward. On June 12, 1970, Sugarman wrote a letter to Schoor enclosing a further check in the sum of $1,000. The letter stated,

I have enclosed to your order a check in the sum of $1,000.00. The Corporation does not have this money. This is my money being submitted to you in good faith because I promised it to you last week. I certainly hope you don't let us down.

The letter also contained a detailed specification of further engineering work that was needed at once in connection with the proposed new financing. Plaintiffs appear to have done

all the work requested, but received no further payment. Shortly thereafter Holmdel Heights Construction Company went into receivership and this suit followed.

The trial judge made the following findings of fact:

1. At the April 14, 1970 meeting Sugarman led Schoor and Schwartz to believe:

a. that the corporation was in financial difficulty;

b. that there was a legitimate prospect of securing further financing;

c. that such financing could not be obtained without further work by Schoor's companies;

d. Sugarman knew that if Schoor would not continue, the corporation did not have sufficient funds to secure the essential engineering services from another source;

e. Sugarman believed that the corporation could solve its difficulties as is evidenced by his July 16, 1970 loan of $5,000;[1]

f. Sugarman had a substantial financial interest in seeing to it that Holmdel Heights was a success;

g. to induce Schoor to continue work, Sugarman intentionally led Schoor and Schwartz to believe that he was pledging his personal finances to payment of past and future corporate debt to Schoor's companies;

h. and that this latter finding is corroborated by the language of Sugarman's letter to Schoor on July 16, 1970.[2]

He further concluded that Sugarman

. . . made an oral promise to Schoor to pay out of his personal finances, if necessary, past and future debts of Holmdel Heights to Schoor's companies in exchange for Schoor's agreement to continue engineering work for the corporation.

The majority of the Appellate Division neither accepted nor rejected these findings, concluding that even if the defendant made a promise to pay, it was unenforceable under the Statute of Frauds. The dissenting member of that Court accepted the findings of the trial judge and also agreed with his resolution of the legal issue.

---

[1] A loan of $5,000 was in fact later made by Sugarman to Holmdel Heights Construction Company on July 16, 1970.

[2] The date should probably be June 12, 1970.

We have carefully examined the trial record. It contains ample support for the findings and factual conclusions reached by the trial judge. He was in a position to observe the witnesses, take note of their demeanor and acquire a "feel of the case" that cannot make its way to a reviewing tribunal. Even on the cold record, however, we would be inclined to reach the same result. We find that the promise was made.

This brings us to the legal issue. Defendant contends that his promise — conceding it to have been made, as we have concluded it was — is unenforceable under the Statute of Frauds. The relevant section of that act reads as follows:

> No action shall be brought upon any of the following agreements or promises, unless the agreement or promise, upon which such action shall be brought or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person thereunto by him lawfully authorized:
> \* \* \* \* \* \* \* \*
> b. A special promise to answer for the debt, default or miscarriage of another person; [N. J. S. A. 25:1-5]

It is conceded by everyone that the promise was not in writing, nor was there any written memorandum or note thereof. Defendant contends that the promise — again assuming it to have been made — obligated him only secondarily to pay the debt owed by Holmdel Heights Construction Company in the event it should default, and that as such it comes squarely within the purview of the statute. Plaintiffs argue that the promise was made largely if not principally for defendant's personal benefit, that it did not create a suretyship relationship but rather was an "original" promise resting upon consideration sought by defendant for his personal ends, and that this being so the promise is not controlled by the statute. This latter argument rests upon what is sometimes referred to as the "leading object or main purpose rule."[3] It has been stated as follows:

---

[3]For an excellent brief history of this rule, see, Grether, "Caveat Promisee: Nebraska's 'New Consideration' Test and the Anachronistic Statute of Frauds," 33 *Neb. L. Rev.* 577, 581-86 (1954).

When the leading object of the promise or agreement is to become guarantor or surety to the promisee for a debt for which a third party is and continues to be primarily liable, the agreement, whether made before or after or at the time with the promise of the principal, is within the statute, and not binding unless evidenced by writing. On the other hand, when the leading object of the promisor is to subserve some interest or purpose of his own, notwithstanding the effect is to pay or discharge the debt of another, his promise is not within the statute. [2 *Corbin on Contracts* § 366, at 273–74 (1950)]

Thus in applying this rule, which we think expresses sound doctrine, it becomes important, and probably decisive, to determine what interest, purpose or object was sought to be advanced by defendant's promise to pay plaintiff's fees. As noted above defendant owned slightly more than 18% of the capital stock of Holmdel Heights Construction Company, for which he had paid $10,000. He was also attorney for the corporation and at the time of trial, January 18, 1973, was still owed $14,000 for legal services. Some part of this, how much we are not specifically told, was already owing to him at the time of the April 14, 1970 conference. Defendant, in the course of his testimony, agreed that had the corporation eventually been successful, the amount he would have received upon his investment, together with reasonably anticipated legal fees, would have been a substantial sum.

On the other hand, defendant was acting as counsel for the development corporation and presumably, in this capacity, was doing all he could to maintain its solvency and to further its best interests. The consideration that was sought and received from plaintiffs took the form of a continuing professional effort on their part to provide the developer with vital materials and data intended to become part of its submission to a finance agency in connection with its application for a substantial loan. Obviously this consideration would be of benefit both to defendant personally, even though indirectly, as well as to the client he served.

Although the leading object or main purpose rule has been widely accepted, neither courts nor commentators have reached agreement as to the analytical method that courts

should adopt and follow in determining whether a particular set of facts does or does not come within the scope of the rule. Professor Williston identified eight different tests as having been from time to time applied by various courts. 3 *Williston on Contracts* §§467–475 (3d ed. Jaeger 1960).

█ █ Recent cases in this state seem to have placed most reliance upon the "original-collateral promise" test and the "credit" test. *Romano v. Brown,* 125 *N. J. L.* 293, 294–95 (E. & A. 1940) ; *The City Nat'l Bank & Trust Co. of Salem v. Hassler,* 9 *N. J. Super.* 153, 157 (App. Div. 1950) ; *Federal Wine & Liquor Co. v. Jabberwock Country Club,* 120 *N. J. L.* 331, 332–33 (E. & A. 1938). The former test amounts to little more than a restatement of the rule itself and may be stated thus : where the leading object or main purpose of the promisor is to become surety for another's debt, the promise is a collateral one and within the Statute of Frauds ; on the other hand, where the principal purpose is to subserve or promote some interest personal to the promisor, then the promise will be deemed an original one and not controlled by the Statute. In applying this test, as is mentioned below, emphasis is placed upon discovering the *leading* object and the *principal* or *main* purpose of the promisor. A chief reason for this approach is that in most cases the consideration for which the new promise is given will clearly benefit *both* the promisor and the original debtor.

The "credit" test calls upon the court to decide to whom in fact credit was given. While this test is useful, it appears to suffer from two drawbacks. In the first place the inquiry focuses upon the subjective intent and state of mind of the promisee. By the time of trial, either consciously or subconsciously, the promisee will probably have come to the conclusion that he extended credit to that person — generally the promisor — who will be the more readily able to respond in damages. Other evidence in the case may very likely be insufficient to overcome what may too often be essentially a self-serving determination by the promisee. In the second place, it will often if not generally be true that the promisee

has in fact relied upon the credit of *both* the promisor and the original debtor.

■ Another test, supported by Professor Williston and others, seeks to determine whether, as a result of the transaction, there has or has not come into being a relationship of surety and principal between the promisor and the original debtor. According to this test, if such a relationship is discovered, the promise will come within the Statute, otherwise it will not. The test is often stated in terms of deciding whether, as between themselves, the promisor or the original debtor should justly and rightly pay the debt. 3 *Williston, supra,* § 475, at 448. This criterion is helpful as far as it goes. In most of the factual situations that present themselves, however, the answer will almost always be that the obligation should be met by the original debtor. Only in cases where the promisor's agreement is clearly of direct and certain benefit to himself and of little or no benefit to the original debtor will this particular issue be otherwise determined. But a decision that the original debtor should be ultimately liable does not necessarily, or even usually, resolve the basic issue. A plaintiff-promisee may have a right of recovery against both the promisor and the original debtor regardless of what the rights and obligations of the latter, *inter sese,* may be. Certainly in many instances the promisor may be entitled, after he has satisfied the promisee's claim, to proceed against the original debtor, and yet there may not have existed between them any antecedent suretyship relationship. In such cases the promisor who has met the obligation simply stands in the shoes of the promisee and proceeds as his equitable assignee. 2 *Corbin, supra,* § 378.

■ The leading object or main purpose rule has been set forth in the Restatement of Contracts § 184 (1932) in the following form:

Where the consideration for a promise that all or part of a previously existing duty of a third person to the promisee shall be satis-

fied is in fact or apparently desired by the promisor mainly for his own pecuniary or business advantage, rather than in order to benefit the third person, the promise is not within [the Statute of Frauds] . . . .

The identical formulation of the rule appears in the *Restatement of Security* § 93 (1941). This statement implicitly recognizes what has been adverted to above, that in many if not most cases the consideration for which the new promise is given will be beneficial *both* to the promisor and to the original debtor. Whether or not the Statute of Frauds will apply is then to depend upon whether this consideration was *mainly* desired for the promisor's benefit or for the benefit of the original debtor. In applying this rule the finder of fact must examine all circumstances bearing upon the transaction, the relationship of the parties to one another and endeavor to discern the intent, purpose and object of the promisor. In undertaking this examination the nature of the consideration will be of great if not paramount importance. To what extent will performance by the promisee benefit the promisor, directly or indirectly?

The present action falls factually within that category of suits where the original debtor is a corporation in which the promisor has a financial interest. Such cases are fairly numerous. Depending upon their particular facts and circumstances, they have been decided both ways.

There are many cases in which a shareholder or officer of a corporation or other party interested in its prosperity has promised a contractor that, if he would continue to supply goods or labor under his contract with the corporation in spite of its defaults, the promisor would pay the bill. If the only expected gain to the promisor is in the protection of the value of his shares, the promise is held to be within the statute; but there are cases in which the promisor was found to have received a special benefit that constituted his "leading object" and made him an original debtor. [2 *Corbin, supra*, § 372 at 298–99]

*Davis v. Patrick,* 141 *U. S.* 479, 12 *S. Ct.* 58, 35 *L. Ed.* 826 (1891) is a much-cited case of this type. There the

statute was held not to control. In that case the defendant was a substantial creditor of a mining company. He orally agreed to see that the plaintiff would be paid, if he would transport ore from the mine to the smelter. The work was done as requested, but defendant refused payment. In response to plaintiff's claim, as set forth in his complaint, defendant interposed the statute of frauds, pointing to the absence of a writing and the fact that the mining company was at all times the principal debtor. In holding the defense ineffective, Justice Brewer observed,

> . . . there is marked difference between a promise which, without any interest in the subject matter of the promise in the promisor, is purely collateral to the obligation of a third party, and that which, though operating upon the debt of a third party, is also and *mainly* for the benefit of the promisor. The case before us is in the latter category. [12 *S. Ct.* at 60, 35 *L. Ed.* at 829; emphasis added]

A further pertinent example appears in the *Restatement of Contracts*, as an illustration under § 184,

> 2. D owes C $1000. C is about to levy an attachment on D's factory. S, who is also a creditor of D's, fearing that the attachment will ruin D's business and thereby destroy his own chance of collecting his claim, orally promises C that if C will forbear to take legal proceedings against D for three months, S will pay D's debt if D fails to do so. S's promise is enforceable.

The interest of defendant, Sugarman, in inducing plaintiffs to undertake the work that they did after the April 14 conference seems obvious. His substantial pecuniary and business interest to be furthered is abundantly clear. On the other hand there is little to support the view that he meant to commit his personal assets to so considerable an extent only to further his client's interest. We have no difficulty in agreeing with the trial court and with the dissenting member of the Appellate Division that the consideration was *mainly* desired for his personal benefit.

Accordingly the judgment of the Appellate Division is reversed and the judgment of the Law Division is hereby reinstated.

*For reversal*—Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—6.

*For affirmance*—None.