Larry SHORB, an incompetent, by his guardian, Barbara SHORB, and Barbara Shorb, in her own right

v.

AIRCO, INC., et al.

Civ. A. No. 82–1983.

United States District Court, E.D. Pennsylvania.

Sept. 30, 1986.

David J. Griffith and Peter J. Deeb, Philadelphia, Pa., for Sandoz.

Peggy L. Kerr and Michael Margaril, New York City, William T. Hangley and Charles F. Forer, Philadelphia, Pa., for Hospal.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

Third-party defendants Sandoz, Inc. ("Sandoz") and Hospal Medical Corporation ("Hospal") have filed cross-motions for summary judgment. Before discussing these motions, I will briefly review the procedural history of this action.

### I.

Plaintiff Larry Shorb suffered severe brain damage when the tubing of a Monaghan series 300 D.O. anesthesia ventilator ("series 300 D.O. ventilator") became disconnected during oral surgery. Plaintiffs sued Airco, Inc. ("Airco"),[1] which sold the allegedly defective ventilator. Airco impleaded three parties: J.J. Monaghan Co.,

---

1. Plaintiffs also named as defendants Ohio Medical Products, a division of Airco, and Air Reduction Co., Inc. and Ohio Chemical and Surgical Equipment, prior names of Airco and Ohio Medical Products, respectively. For simplicity's sake, all of these defendants will be referred to collectively as Airco.

Inc. ("Monaghan"), the original manufacturer of the series 300 D.O. ventilator, and Sandoz and Hospal, Monaghan's alleged corporate successors. Sandoz, in turn, cross-claimed against Hospal for contribution and/or indemnification, alleging that Hospal had, by contract and operation of law, assumed all liabilities relating to the series 300 D.O. ventilator.

On the eve of trial, a settlement was agreed to by all parties. Pursuant to that settlement, all claims were satisfied except Sandoz's cross-claim against Hospal, which was expressly reserved. That cross-claim is the subject of the pending summary judgment motions.

## II.

The facts of record relevant to Sandoz's claim against Hospal are as follows. The series 300 D.O. ventilator was designed and originally manufactured by the J.J. Monaghan Co., Inc. Sandoz purchased that company, together with all aspects of the production of the series 300 D.O. ventilator, in June, 1969. Thereafter, Monaghan became an unincorporated division of Sandoz (the "Monaghan division"). J.J. Monaghan Co., Inc. no longer exists, having filed articles of corporate dissolution in June, 1970.

Sandoz continued to manufacture the series 300 D.O. ventilator until 1976, when it transferred its Monaghan division to Hospal,[2] which at that time was Sandoz's wholly owned subsidiary. That transfer was part of a larger transaction involving a joint venture between Sandoz, Ltd. (hereinafter referred to as "Limited" to distinguish it from Sandoz, Inc., which will be referred to as Sandoz), which was Sandoz's parent corporation, and Rhone-Poulenc, a French corporation. The overall purpose of the transfer of the Monaghan division from Sandoz to Hospal was to centralize in one corporation all aspects of Limited's hospital supply business in the United States. After the transfer, Sandoz sold all of Hospal's outstanding stock to Limited,

which contributed the stock to its joint venture with Rhone-Poulenc.

The transfer of Sandoz's Monaghan division to Hospal occurred in two steps. By agreement dated November 30, 1976 and entitled "Agreement to Transfer Assets and Bill of Sale" ("the 1976 Agreement"), Sandoz transferred to Hospal the physical and business assets of the Monaghan division, including, *inter alia,* land, equipment, enumerated contract rights, patents, trademarks, goodwill and customer lists. In a second agreement, entitled "Agreement for Assignment of Receivables[,] Sale of Inventory [and] Assumption of Payables" and dated January 15, 1977 ("the 1977 Agreement"), Sandoz assigned and sold to Hospal the inventory and its interest in the accounts receivable of the Monaghan division. In consideration of that assignment, Hospal assumed all liability for the payables of the Monaghan division and agreed to issue to Sandoz a promissory note in the principal amount of $6,814,883.75. In the same agreement, Limited guaranteed the obligations of Hospal to Sandoz on the payables and the promissory note. In exhibits to the 1977 Agreement, precise dollar amounts were attributed to the receivables and payables.

Neither the 1976 nor the 1977 Agreement (collectively the "Agreements") contained an express assumption by Hospal of the contingent or inchoate liabilities of Sandoz. The 1976 Agreement, in fact, expressly provided that no liabilities of Sandoz were to be transferred to Hospal:

[Sandoz] does hereby grant, convey, assign, transfer and set over unto [Hospal] ... the assets of [Sandoz] described [herein] (but in no case to include any indebtedness or other liabilities of [Sandoz]).

The 1977 Agreement expressly provided for assumption by Hospal of Sandoz's liabilities only as follows:

[Hospal] agrees to indemnify and hold Sandoz harmless from and against any

2. Actually, the transfer was to Vital Assists, Inc. ("Vital Assists"), which later changed its name to the Hospal Medical Corporation. To simplify the description of the relevant corporate transactions, I will refer to both Vital Assists and Hospal Medical Corporation as Hospal.

and all claims, obligations, costs, liabilities, loss or damage ... (including reasonable attorney's fees) arising out of or related to the Payables.

The "Payables" were identified in an exhibit to the 1977 Agreement as "amounts owing to vendors and other parties for obligations incurred by Sandoz, Inc.'s Monaghan [d]ivision in the purchase of inventory ... in the ordinary course of business" and "amounts owing by Sandoz, Inc. and incurred in the oridinary [sic] course of business of its Monaghan [d]ivision."

The scrivener of the Agreements was Richard M. Burt, who in 1976 and 1977 was assistant counsel for Sandoz. In an affidavit submitted by Sandoz in support of its motion for summary judgment, Burt avers that there was an "explicit and implicit" agreement among Sandoz, Hospal, Limited, and Rhone-Poulenc that Hospal would assume "all aspects ... including contingent or inchoate liabilities of the Monaghan [d]ivision." According to Burt, he did not include in the Agreements an express clause concerning contingent or inchoate liabilities because "litigation was not foreseen on the issue as it was uncontested and of little relative importance at the time." He avers that, had he foreseen the present dispute, he would have included in the Agreements a clause transferring contingent or inchoate liabilities to Hospal in order to "express the agreement which existed and to avoid disputes." Finally, Burt avers that, after the ownership of Hospal was transferred to the joint venture between Limited and Rhone-Poulenc, Hospal "proceeded to insure itself against product liability claims."

Sandoz also submitted the affidavit of Herbert Wohlmann, who in 1976 and 1977 was a member of Limited's legal division. In that capacity, he participated in negotiating the joint venture between Limited and Rhone-Poulenc. Wohlmann avers, *inter alia*, that "[i]t was understood, by the parties to the joint[ ]venture, that each of the hospital supply businesses contributed would carry with them [sic] liabilities, including contingent liabilities" and that "[t]here was an implicit agreement to this effect." Hospal did not submit affidavits averring facts contrary to the averments of Burt and Wohlmann.

As a result of the 1976 and 1977 Agreements, Hospal acquired Sandoz's entire anesthesia ventilator line. After the acquisition, Hospal produced the series 300 D.O. ventilator for some unspecified period of time,[3] using the same business procedures, production methods and production plant that Sandoz had used. The accident which left plaintiff Larry Shorb brain damaged occurred in February, 1980. The date of sale of the ventilator involved in the accident is unknown, although Sandoz does not contend that the sale occurred after it transferred its Monaghan division to Hospal.[4]

### III.

Sandoz advances two theories upon which Hospal may be liable. First, Sandoz argues that Hospal expressly and impliedly agreed to assume all liability for claims related to the sale and manufacture of the

---

**3.** Hospal asserts in a memorandum of law that it discontinued the manufacture and sale of anesthesia ventilators in 1978. However, Hospal does not point to, and my laborious review of the record does not reveal, any evidence of record in support of that assertion.

**4.** Sandoz asserts, without evidentiary support, that the sale has been traced to the years 1969 to 1970.

The record does not reveal whether the sale occurred before or after Sandoz purchased Monaghan and began to manufacture the series 300 D.O. ventilator. Hospal asserts that, insofar as it may be pertinent, Sandoz should be viewed as the manufacturer and original tortfeasor because, in the written agreement of sale between Monaghan and Sandoz, Sandoz expressly agreed to assume all liability for personal injury claims based on Monaghan's products where the event giving rise to such liability occurred after the closing date of the sale. However, the document which Hospal has submitted in support of this assertion, while apparently a copy of a contract between Monaghan and Sandoz, is not executed, and Hospal has not even attempted to authenticate it. Therefore, I cannot conclude that the document indeed is what it appears to be.

series 300 D.O. ventilator. Second, it argues that Hospal should be held liable under the product line theory of successor liability.[5]

Initially, I must determine which state's law applies to each of these issues. As to the contract claims, both Sandoz and Hospal assert, and I agree, that the applicable law is that of New Jersey.

As to the product line theory, Hospal asserts that the applicable law is either that of Pennsylvania, the plaintiffs' domicile at all relevant times, or that of New Jersey or Colorado, the principal places of business of Sandoz and Hospal, respectively, at the time Sandoz transferred its Monaghan division to Hospal. Hospal argues that, as to the product line theory, the law of these three states is the same, and therefore that no choice of law is necessary. In contrast, Sandoz argues that, at least as between Pennsylvania and New Jersey, there is a true conflict of laws. Sandoz and Hospal agree, however, that if a choice of law must be made, interest analysis, *see Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964), mandates the application of Pennsylvania law.

I agree with Hospal that no choice of law is necessary. I also agree with the parties that, insofar as a choice of law is necessary, Pennsylvania law appears to apply, because the purpose of the product line theory is to compensate tort victims, *see infra* pp. 927–928, giving plaintiffs' state of domicile the strongest interest. To examine this conclusion, however, one must go beyond choice of law principles and address a question of substantive law: What does an interest in compensating tort victims have to do with determining the rights and duties *inter se* of predecessor and successor corporations? This question is at the heart of the parties' disagreement as to the applicability of the product line theory

to Sandoz's cross-claim against Hospal, an issue to which I now turn.

### IV.

■ The product line theory is an exception to the general rule that "when one company sells or transfers all of its assets to a successor company, the successor does not acquire the liabilities of the transferor corporation merely because of its succession to the transferor's assets." *Dawejko v. Jorgensen Steel Co.*, 290 Pa.Super. 15, 18, 434 A.2d 106, 107 (1981); *accord Hickman v. Thomas C. Thompson Co.*, 592 F.Supp. 1282, 1283–84 (D.Colo.1984) (discussing Colorado law); *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 340, 431 A.2d 811, 815 (1981). It was developed by the California Supreme Court in *Ray v. Alad Corp.*, 19 Cal.3d 22, 560 P.2d 3, 136 Cal. Rptr. 574 (1977), and has been adopted by the courts of New Jersey and Pennsylvania. *See Ramirez*, 86 N.J. at 358, 431 A.2d at 824–25; *Dawejko*, 290 Pa.Super. at 23–26, 434 A.2d at 110–11; *see also Hickman*, 592 F.Supp. at 1284–86 (predicting that Colorado would adopt the product line exception).[6]

The product line exception provides that: [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Ramirez*, 86 N.J. at 358, 431 A.2d at 825; *see also Hickman*, 592 F.Supp. at 1284 (citing *Ramirez* formulation); *Dawejko*, 290 Pa.Super. at 23–26, 434 A.2d at 110–11 (citing and adopting same). Its purpose is

---

**5.** At one point, Sandoz also argued that entry of summary judgment in its favor was warranted because, Hospal not having answered Sandoz's cross-claim, the factual allegations therein should be deemed admitted. However, Hospal has long since answered the cross-claim, and Sandoz no longer presses this argument. Therefore, I will not address it.

**6.** For purposes of this discussion, I will assume, without deciding, that the *Hickman* court's prediction was correct.

to serve the social policies underlying strict products liability. *E.g., Ramirez*, 86 N.J. at 358, 431 A.2d at 825; *Dawejko*, 290 Pa.Super. at 26, 434 A.2d at 111. In accordance with this purpose, the California Supreme Court in *Ray* articulated three circumstances justifying the imposition of liability on a successor corporation under the product line exception:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading rule [sic], and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

19 Cal.3d at 31, 560 P.2d at 8–9, 136 Cal. Rptr. at 579–80. The New Jersey and Pennsylvania courts have held that the existence of these three circumstances is an important, *see Ramirez*, 86 N.J. at 349–53, 431 A.2d at 820–22, although not necessarily the requisite or exclusive consideration, *see Dawejko*, 290 Pa.Super. at 26, 434 A.2d at 111, in determining whether the product line exception applies.

It is undisputed in this case that Hospal acquired Sandoz's entire anesthesia ventilator product line. It is also undisputed that, after the transfer of its Monaghan division to Hospal, Sandoz remained a viable corporation. The parties' disagreements are in two areas: whether, as a factual matter, certain of the considerations weighing in favor of the imposition of successor liability are present in this case, and, more importantly, whether one corporation which acquires from a second corporation an entire product line, but not all of its assets, may be held liable under the product line exception when the second corporation is still viable. I will address the latter issue first.

Sandoz argues, of course, that the product line exception is applicable to such a situation. There is some support in the case law for Sandoz's position, *see Amader v. Pittsburgh Corning Corp.*, 546 F.Supp. 1033, 1036–37 (E.D.Pa.1982), although the weight of authority is to the contrary. *See, e.g., Reed v. Armstrong Cork Co.*, 577 F.Supp. 246, 251 (E.D.Ark.1983) (assuming Pennsylvania law applied, reaching conclusion opposite that reached by *Amader* court); *Shaw v. Pittsburgh-Corning Corp.*, 10 Phila. 472, 476–78, 28 Pa.D. & C.3d 97, 102–04 (1984); *Pizio v. Johns-Manville Corp.*, 9 Phila. 447, 454–55 (1983); *accord, e.g., Kline v. Johns-Manville*, 745 F.2d 1217, 1219–21 (9th Cir.1984) (applying California law). However, even assuming *arguendo* that, under the applicable case law, a plaintiff may maintain an action under the product line exception against a corporation which acquires the relevant product line from, but not all the assets of, a second corporation, I conclude that neither the case law nor common sense permits the extension of the product line exception to the present case.

Here, the question is not the remedies available to a tort victim, but the rights and duties *inter se* of two corporations. The only case which I have found that addresses the applicability of the product line exception in this context—a case cited by both parties in support of their diametrically opposed positions—is *Nieves v. Bruno Sherman Corp.*, 86 N.J. 361, 431 A.2d 826 (1981). In *Nieves*, the plaintiff sought recovery from two successor corporations. The original manufacturer of the product which caused the plaintiff's injury had undergone dissolution after selling its assets to the first successor. A few years later, the first successor sold the offending product line to a second corporation. Both successors were viable at the time of the plaintiff's injury. The court held that both the intermediate and the ultimate successor to the offending product line could be held liable under the product line exception, emphasizing that the policy considerations underlying the exception were applicable to both corporations: the interim successor had "contributed to the destruction of the plaintiff's remedies against the original

manufacturer," *id.* at 371, 431 A.2d at 831, and both the interim and the ultimate successor were in a better position than the user of the product to bear risk-spreading and accident avoidance costs. *Id.* at 368–71, 431 A.2d at 830–31.[7]

The *Nieves* court did not, however, apply the principles underlying the product line exception to determine the rights *inter se* of the two corporate successors. Rather, it concluded that:

> As between the two successor corporations the provisions of [the indemnification clause of their purchase agreement], if applicable to the particular fact situation presented, should be given their intended effect as a risk-spreading and cost-avoidance measure. While the *Ramirez* rationale [discussed *supra* pp. 927–928] is concerned with imposing strict tort liability for damages caused by defects in units of the product line acquired and continued by successor manufacturers, neither *Ramirez* nor the injured plaintiff—if he successfully proves his case against the successors, who stand in the shoes of the original manufacturer—is concerned with how that liability will be allocated or borne as between two successor corporations.

*Id.* at 372, 431 A.2d at 832 (citations omitted).

In this case, as in *Nieves*, the retention by Sandoz and/or assumption by Hospal of contingent liability is a matter which was allegedly the subject of contractual negotiations between the parties. In light of this, Sandoz's argument that the principles behind the product line exception mandate imposition of liability upon Hospal is preposterous. If, in a contract, Sandoz and Hospal agreed that Sandoz would be responsible for all contingent liabilities related to the series 300 D.O. ventilator, it

would be an act of superarrogation for the judiciary, in the guise of applying the product line exception, to rewrite their contract. Such a result is not contemplated, let alone mandated, by any of the cases on the product line exception, the purpose of which is to compensate otherwise remedyless tort victims, not to preempt the role of contract in corporate successorships.[8]

Sandoz submits that the only difference between this case and the cases in which the product line exception has been applied is that, in this case, plaintiffs' claims have been settled. Based on that premise, Sandoz argues that limiting the product line exception to cases in which the plaintiffs have not settled would contravene the policy of the courts of Pennsylvania and New Jersey to encourage settlements.

Sandoz's argument is specious, because the premise upon which it rests is faulty. It is not the fact that plaintiffs' claims have been settled, but the fact that the retention or assumption of contingent liabilities was a matter about which the parties had every opportunity to, and in fact allegedly did, contract, that sets this case apart from the cases in which courts have held that a successor corporation may be liable to an injured plaintiff under the product line exception.

Really, Sandoz is using the product line exception as a fallback position: if it cannot prevail on a contract theory, it seeks to hold Hospal liable in tort. However, that the contracts at issue raise thorny questions of contractual intent and construction, *see infra* pp. 930–934, is simply no reason to supplant them with judicially imposed tort principles. I hold that the product line exception is not applicable to Sandoz's cross-claim, and that Sandoz is not

---

7. Whether the present case is factually analogous to *Nieves* is unclear, as the record does not disclose whether Monaghan or Sandoz was the manufacturer of the ventilator involved in plaintiff Larry Shorb's injury. *See supra* note 4. However, in light of my conclusion as to the

applicability of the product line exception to the rights and duties of corporations *inter se,* I find it unnecessary to address this factual issue.

8. It is upon this conclusion that I reach my holding that no choice of law is necessary. *See supra* p. 927.

930

entitled to summary judgment against Hospal on this theory.[9]

## V.

If Hospal is to be held liable to Sandoz, it must be on a contract theory. Sandoz asserts that it is entitled to summary judgment because under the 1976 and 1977 Agreements, with the addition of parol terms, Hospal expressly and impliedly agreed to assume contingent liabilities for claims related to the series 300 D.O. ventilator. Hospal argues that no contract to assume contingent liabilities is expressed or can be implied from the terms of the Agreements as written. Further, it argues that the Agreements must be enforced as written, without the addition of parol terms, and therefore that summary judgment should be entered in its favor.

### A.

█ I will first address Sandoz's argument that Hospal impliedly agreed to assume contingent liabilities. Sandoz argues, *inter alia,* that: (i) there is no language in the 1976 Agreement as to the assumption of liabilities; and (ii) the assumption by Hospal in the 1977 Agreement of liability for claims "arising out of" the payables, defined as "amounts owing by Sandoz, Inc. and incurred in the oridinary [sic] course of business of its Monaghan [d]ivision," may be interpreted as an implied agreement to assume contingent product liabilities. In support of its argument, Sandoz relies on cases in which a corporate successor's assumption of broad categories of its predecessor's liabilities was held to encompass the assumption of inchoate product liability claims. *See Bouton v. Litton Industries, Inc.,* 423 F.2d 643, 652 (3d Cir.1970) (applying New York law); *Bippus v. Norton Co.,* 437 F.Supp. 104, 105–07 (E.D.Pa.1977) (applying Pennsylvania law).

Sandoz's reliance upon *Bouton* and *Bippus* is misplaced, as those cases are distinguishable on their facts. Contrary to Sandoz's assertion, the 1976 Agreement was not silent on the question of whether liabilities were to be assumed. In fact, that Agreement expressly provided that Hospal did not assume any of Sandoz's liabilities. *See supra* p. 925. In addition, Hospal did not, in the 1977 Agreement, assume broad categories of liabilities, but assumed liability only for the payables.

Sandoz's argument that Hospal's assumption of liability for the payables included the assumption of contingent liabilities is equally unavailing, as it rests on a strained reading of the contractual language. The payables are not defined in the language of contingent liability, *i.e.,* as amounts which are or may become owing, but rather as "amounts owing" only. Moreover, in the only New Jersey case cited by the parties, the court held that a successor's agreement to assume liabilities incurred by its predecessor "in the usual course of its manufacturing business, but not otherwise" could not be construed as an express or implied assumption of contingent tort liabilities. *McKee v. Harris-Seybold Co.,* 109 N.J.Super. 555, 562–63, 264 A.2d 98, 102–03 (Law Div.1970), *aff'd mem.,* 118 N.J.Super. 480, 288 A.2d 585 (App.Div.1972).

Accordingly, I conclude that, under the case law cited by Sandoz, an agreement by Hospal to assume contingent tort liabilities cannot be implied from the 1976 and 1977 Agreements as written.[10]

### B.

Sandoz concedes that there is no written provision in the Agreements whereby Hospal expressly agreed to assume contingent or inchoate liabilities related to Sandoz's Monaghan division. Its express contract

---

9. In light of this conclusion, I find it unnecessary to address the parties' dispute as to whether, as a factual matter, various considerations weighing in favor of the imposition of successor liability are present in this case.

10. In light of this conclusion, I find it unnecessary to reach Sandoz's argument that its interpretation of the contractual language is supported by Burt's averment that, after it purchased Sandoz's Monaghan division, Hospal proceeded to insure itself against product liability claims.

theory relies upon the averments of Burt and Wohlmann that such an agreement existed but was not, for a variety of reasons, reduced to writing.

A threshold issue is whether the addition of parol terms to the Agreements is barred by the parol evidence rule. This rule provides that, when the parties to a contract have expressed their agreement in a writing, to which they have assented as the complete and accurate integration of their contract, parol evidence will not be admitted to add to or vary its terms. *See, e.g., United States v. Clementon Sewerage Authority,* 365 F.2d 609, 613 (3d Cir.1966) (applying New Jersey law).

Hospal argues that the Agreements as written are an integrated expression of the entire contract which existed between Sandoz and Hospal, and that parol evidence is therefore inadmissible. In support of its argument, Hospal points out that the 1977 Agreement "could hardly be more detailed" with respect to the matters with which it deals, particularly since the dollar values assigned to the assets and liabilities transferred were calculated to the penny. Hospal contends that a contract with such precision simply does not admit of any room for the assumption of contingent or inchoate liabilities.

Hospal's argument misconceives the manner of proving whether the parties to a contract assented to a writing as the complete expression of their agreement. Under New Jersey law, integration cannot be proven by reference only to the four corners of the written instrument:

> Whether a particular subject of negotiation is embodied by the writing depends wholly upon the intent of the parties; but intent must be judged by an external standard.... "The document alone will not suffice. What it was intended to cover cannot be known till we know what there was to cover. The question being whether certain subjects of negotiation were intended to be covered, we must compare the writing and the negotiations before we can determine whether they were in fact covered."

*Atlantic Northern Airlines, Inc. v. Schwimmer,* 12 N.J. 293, 304, 96 A.2d 652, 657 (1953) (quoting *Wigmore on Evidence* §§ 2413, 2430–31 (3d ed.)); *see also Clementon Sewerage,* 365 F.2d at 613–14 (discussing *Schwimmer*). While the factors pointed to by Hospal are probative, they simply are not dispositive on the issue of assent. *See Schwimmer,* 12 N.J. at 306, 96 A.2d at 658 (writing is an influential evidential factor, but is not conclusive of the issue); *see also* 3 A. Corbin, *Corbin on Contracts* § 585, at 485–87 (1960). In light of the Burt and Wohlmann affidavits, which support Sandoz's contention that the parties did not assent to the written agreements as the complete expression of their contract, I conclude that there are genuine issues of material fact, and therefore that, as to this issue, neither party is entitled to summary judgment.

### C.

Under New Jersey law contractual limitations on liability for one's own negligence are not favored, and will not be enforced unless bargained for by the parties. *E.g., Consumers Power Co. v. Curtiss-Wright Corp.,* 780 F.2d 1093, 1096 (3d Cir.1986). Agreements providing indemnity for such negligence must, therefore, be clearly and plainly expressed, and are strictly construed against the party relying on them. *E.g., Rubin v. AMC Home Inspection & Warranty Service,* 175 N.J.Super. 315, 321, 418 A.2d 306, 309 (Law Div.1980). Here, Sandoz contends that, by parol agreement, Hospal assumed its contingent tort liabilities. At oral argument, I requested Sandoz to address the following question: Can a parol agreement ever be sufficiently specific to meet the requirement that an indemnity contract be expressed in language that is clear and unequivocal?

In response, Sandoz advanced two arguments. First, it argued that ·the issue should not be looked at narrowly as one of indemnity, but should be looked at as a matter of the parties' intent in the context of a corporate transition. Second, it pointed ed out that the Burt and Wohlmann affida-

vits, to which affidavits in contradiction were not submitted, state that it was the intention of the parties that Hospal would assume the contingent liabilities of Sandoz's Monaghan division.

■ For purposes of the summary judgment motions, I am convinced by Sandoz's arguments. Although neither party has cited any New Jersey cases on this issue, I have found some authority for Sandoz's position that the undertaking of obligations in the context of corporate transition should not be viewed merely as indemnification. In *Bouton*, 423 F.2d at 650–51, the Third Circuit addressed the issue of whether a corporation which had purchased the assets and business of another, and had allegedly assumed its contingent liabilities, was an indemnitor. The court held that it was not: "[i]f the liabilities in dispute were undertaken, they were undertaken by assumption and not merely by way of indemnification." *Id.* at 651 (New York law).

More importantly, the Burt and Wohlmann affidavits support Sandoz's argument that the assumption by Hospal of contingent tort liabilities was the subject of negotiation and agreement between the parties. The reason that exculpatory clauses must be clearly expressed is that "[w]ithout such unequivocable [sic] language it is considered that the minds of the parties did not intend that the exoneration include a party's own wrongdoing." *Rubin*, 175 N.J.Super. at 321, 418 A.2d at 309. I conclude that there is sufficient evidence of record to support Sandoz's assertion that the assumption by Hospal of contingent liabilities was indeed the parties' intent, and therefore that summary judgment should not be entered against Sandoz on this basis.

### D.

The argument pressed most strongly by Hospal in support of its position that the Agreements must be enforced as written is that the Agreements are within the Statute of Frauds, N.J.Stat.Ann. § 25:1–5 (West 1940), and therefore, even if unintegrated, cannot be added to or varied by parol evidence. Sandoz raises both procedural and substantive arguments against Hospal's position.

#### 1.

Sandoz argues that Hospal has waived its Statute of Frauds defense because it did not plead it in its answer to the cross-claim as required by Federal Rule of Civil Procedure 8(c). In response, Hospal argues that Sandoz's cross-claim did not put it on notice that Sandoz intended to proffer parol evidence and that, after it learned of Sandoz's intention to proffer the same, it informed Sandoz in a timely manner of its intention to raise a Statute of Frauds defense. Hospal seeks leave of court to amend its answer formally to raise this defense.

■ Federal Rule of Civil Procedure 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires." Here, although Sandoz asserts that it would be prejudiced were Hospal now permitted to raise its Statute of Frauds defense, its assertion is conclusory. Sandoz does not even allude to any specific way in which it would be harmed. Therefore, I will permit Hospal to amend its answer to assert its Statute of Frauds defense.

#### 2.

I need not determine whether the 1976 Agreement is within the Statute of Frauds, as Sandoz states that it does not contend that any liabilities were transferred to Hospal under that contract. As to the 1977 Agreement, the Statute of Frauds provides, in relevant part, that no action shall be brought upon a "special promise to answer for the debt, default or miscarriage of another person" unless the promise upon which the action is brought is in writing. N.J.Stat.Ann. § 25:1–5(b). Sandoz does not dispute that Limited was the guarantor of Hospal's obligations to Sandoz under the 1977 Agreement. Nor does it dispute Hospal's argument that, if the guaranty in that contract is within the Statute of Frauds, the entire 1977 Agreement is within the statute and therefore must be enforced as

written.[11] Sandoz argues, however, that the guaranty at issue is not within the Statute of Frauds, and therefore that there is no bar to the addition of oral terms to the contract.

■ Sandoz's argument rests upon the rule that a guaranty is within the Statute of Frauds only if it was not made principally for the guarantor's personal benefit:

> When the leading object of the promise or agreement is to become guarantor or surety to the promisee for a debt for which a third party is and continues to be primarily liable, the agreement, whether made before or after or at the time with the promise of the principal, is within the statute, and not binding unless evidenced by writing. On the other hand, when the leading object of the promisor is to subserve some interest or purpose of his own, notwithstanding the effect is to pay or discharge the debt of another, his promise is not within the statute.

*Howard M. Schoor Associates v. Holmdel Heights Construction Co.*, 68 N.J. 95, 102, 343 A.2d 401, 404–05 (1975) (quoting 2 *Corbin on Contracts* § 366, at 273–74 (1950)). Sandoz argues that the "leading object" of Limited's guaranty was to accomplish the transfer of the Monaghan division from Sandoz, one of Limited's subsidiaries, to Hospal, which was also owned by Limited. Sandoz contends that the primary beneficiary of this transfer was Limited, because the overall purpose of the transfer was to consolidate in one corporation all aspects of Limited's hospital supply business in the United States. Thus, Sandoz concludes that Limited made the guaranty primarily for its own purposes, taking it out of the Statute of Frauds.

In response, Hospal argues that Sandoz incorrectly relies on "what it hypothesizes to be Limited's subjective intent with respect to the transaction as a whole" rather than on "objective facts." Hospal contends that the most important objective indicium of a guarantor's leading object is the con-

sideration received for his promise. Turning to the 1977 Agreement, which Hospal argues is the only evidence of record related to Limited's purpose in making the guaranty, Hospal asserts that the consideration for Limited's guaranty was the transfer to Hospal of the inventory and accounts receivable of Sandoz's Monaghan division, and that Hospal, not Limited, was the primary beneficiary of that consideration.

■ I disagree with Hospal's argument in two important respects. That the overall purpose of the transfer of the Monaghan division to Hospal was to consolidate Limited's hospital supply business is not, as Hospal contends, a hypothesis, but an averment made by Sandoz in its motion for summary judgment that Hospal specifically admitted. Moreover, assuming, without deciding, that Hospal is correct in arguing that a guarantor's leading purpose must be determined by looking at objective facts rather than subjective intent, *see id.* at 103, 343 A.2d at 405–06, Hospal is incorrect insofar as it argues that intent, or anything else that is not expressed within the four corners of the contract, is irrelevant. In fact, intent, at least as ascertained through objective facts, is crucial. In *Schoor*, the court held that "[i]n applying [the leading object] rule the finder of fact must examine all circumstances bearing upon the transaction [and] the relationship of the parties to one another and endeavor to discern the intent, purpose and object of the [guarantor]." *Id.* at 105, 343 A.2d at 406. It is based upon the circumstances extrinsic to the contract at issue that the finder of fact must answer the leading object rule's critical question: To what extent will the bargained for consideration benefit the guarantor? *See id.* at 105, 343 A.2d at 406.

While Sandoz has not submitted any direct evidence of Limited's purpose in making the guaranty, there are affidavits and admissions of record from which a finder of fact could reasonably infer that Limited's purpose was to accomplish the trans-

**11.** Because Sandoz has chosen not to put this at issue, I express no opinion on Hospal's argu-
ment.

fer of the Monaghan division to Hospal, and therefore that it made the guaranty primarily for its own benefit, even though it was Hospal that directly received the inventory and accounts receivable. Accordingly, I conclude that the applicability of the Statute of Frauds entails resolution of genuine issues of material fact, and that Hospal is not entitled to summary judgment based on this defense.

## VI.

In summary, I conclude that: (i) Hospal cannot be held liable to Sandoz under the product line exception; (ii) an agreement by Hospal to assume contingent tort liabilities cannot be implied from the Agreements as written; and (iii) whether the Agreements must be enforced as written, without the addition of parol terms, involves genuine issues of material fact, precluding the entry of summary judgment. Accordingly, I will deny both motions, except insofar as Hospal has requested leave to amend its answer to raise a Statute of Frauds defense.

An appropriate order will be entered.